IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 23-4360 (L), 23-4361, 23-4362, 23-4368

———————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

KEVIN PEREZ SANDOVAL, ROBERTO CARLOS CRUZ MORENO,
JOSE ROSALES JUAREZ, AND MARVIN TORRES

*Appellants*.

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria
*The Honorable Anthony J. Trenga, District Judge*

———————————

BRIEF OF THE UNITED STATES

———————————

Jessica D. Aber
United States Attorney

Amanda St. Cyr
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

*Attorneys for the United States of America*

# Table of Contents

**Page**

Table of Authorities ........................................................................... iii

Introduction ...........................................................................................1

Issues Presented ...................................................................................2

Statement of the Case............................................................................2

    A.    Translations. ......................................................................8

    B.    Post-trial impeachment evidence related to Claudio Saa....................12

    C.    Procedural history..............................................................14

Summary of Argument ........................................................................16

Argument..............................................................................................18

I.    The district court did not abuse its discretion in denying a mistrial based on immaterial mistranslations of a witness's testimony. ....................18

    A.    The record does not reflect widespread error in Prado's translations..........................................................................20

    B.    The few identified mistranslations do not create grave doubt as to the accuracy or scope of the translation at trial..............................22

    C.    Because the few identified mistranslations were immaterial, the trial was fundamentally fair.................................................26

II.    The district court did not abuse its discretion in denying a new trial based on the post-trial disclosure of impeachment evidence. ......................29

    A.    Defendants were not entitled to a new trial under Rule 33 because the evidence is merely impeaching, immaterial, and would not have probably produced an acquittal. ...............................29

i

    B.    Defendants were not entitled to a new trial under *Brady* because the government did not suppress the post-trial evidence relating to Saa and the evidence is not material. ...............................................35

        1.   The post-trial impeachment evidence about Saa is not material under *Brady*.....................................................................35

        2.   The government did not suppress post-trial impeachment information about Saa. ..................................................43

        3.   Defendants' inability to cross-examine Saa at trial regarding the post-trial impeachment evidence was harmless......................53

Conclusion .................................................................................................55

Statement Regarding Oral Argument ......................................................56

Certificate of Compliance .........................................................................56

# Table of Authorities

**Cases**

*Beyle v. United States*, 269 F. Supp. 3d 716 (E.D. Va. 2017) ..................................19

*Castrejon v. United States*, No. 5:19-cr-111-D-2, 2022 WL 4099458
    (E.D.N.C. Sept. 7, 2022)........................................................................19

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986)............................................... 53, 54

*Greer v. United States*, 593 U.S. 503 (2021)...........................................................21

*Horner v. Nines*, 995 F.3d 185 (4th Cir. 2021)............................................... passim

*Kyles v. Whitney*, 514 U.S. 419 (1995).....................................................................36

*Michel v. United States*, 849 F. Supp. 2d 649 (W.D. Va. 2012)............................19

*Moseley v. Branker*, 550 F.3d 312 (4th Cir. 2008) ................................................35

*Neder v. United States*, 527 U.S. 1 (1999)..............................................................21

*Strickler v. Greene*, 527 U.S. 263 (1999) ...............................................................36

*United States v. Ali*, 991 F.3d 561 (4th Cir. 2021) ......................................... passim

*United States v. Bagley*, 473 U.S. 667 (1985) ........................................................36

*United States v. Banks*, 104 F.4th 496 (4th Cir. 2024) .............................. 37, 38, 41

*United States v. Barahona*, 606 F. App'x 51 (4th Cir. 2015)...............................18

*United States v. Bartko*, 728 F.3d 327 (4th Cir. 2013) ..................................... 38, 39

*United States v. Blankenship*, 19 F.4th 685 (4th Cir. 2021) ..................................52

*United States v. Chavis*, 880 F.2d 788 (4th Cir. 1989)..................................... 30, 32

*United States v. Custis*, 988 F.2d 1355 (4th Cir. 1993)..........................................31

*United States v. Dixon*, 481 F. App'x 806 (4th Cir. 2012).....................................20

*United States v. Dorlouis*, 107 F.3d 248 (4th Cir. 1997)......................................20

*United States v. Fletcher*, 993 F.2d 1540, 1993 WL 149916 (4th Cir.
    1993) ...................................................................................................54

*United States v. Garcia*, 948 F.3d 789 (7th Cir. 2020).................................. passim

*United States v. George*, 95 F.4th 200 (4th Cir. 2024).................................... 35, 42

*United States v. Gomez*, 908 F.2d 809 (11th Cir. 1990)........................................26

*United States v. Huang*, 960 F.2d 1128 (2d Cir. 1992) .............................. 18, 19, 27

*United States v. Joshi*, 896 F.2d 1303 (11th Cir. 1990).................................... 18, 19

*United States v. Leiva*, 821 F.3d 808 (7th Cir. 2016) ........................... 18, 25, 28

*United States v. Long*, 301 F.3d 1095 (9th Cir. 2002)............................. 18, 19, 26

*United States v. Mata*, No. 98-4843, 1999 WL 427570 (4th Cir. June 25, 1999) ........................................................................................ 19, 26

*United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010)............................... passim

*United States v. Saint Louis*, 889 F.3d 145 (4th Cir. 2018)...................................20

*United States v. Taylor*, 942 F.3d 205 (4th Cir. 2019) .................................... passim

*United States v. Taylor-Sanders*, 88 F.4th 516 (4th Cir. 2023)............................24

*United States v. Wallace*, 515 F.3d 327 (4th Cir. 2008)........................................20

*United States v. Wilson*, 901 F.2d 378 (4th Cir. 1990)..........................................52

*United States v. Wolf*, 860 F.3d 175 (4th Cir. 2017) ...................................... 29, 30

**Rules**

Fed. R. Crim. P. 33...................................................................................................25

Fed. R. Evid. 403 ....................................................................................................30

**Constitutional Provisions**

U.S. Const. amend. VI .............................................................................................50

# Introduction

In March and August 2019, members and supporters of the Guanacos Lil Cycos Salvatruchas ("GLCS"), an MS-13 clique operating in northern Virginia, attempted to murder two perceived gang rivals to prove their devotion to MS-13 and to rise within its ranks. In March 2019, GLCS members lured victim E.P.A. into a car driven by defendant Carlos Cruz Moreno under the false pretense of taking him to smoke marijuana in the woods, then shot and stabbed him multiple times, attempted to slit his throat, and finally fled, leaving him to die. A few months later, defendant Marvin Torres identified a perceived gang rival, victim N.M.S., frequenting a laundromat where GLCS members hung out, and circulated a photograph of N.M.S. to alert his fellow gang members, who enthusiastically plotted N.M.S.'s death. One day in August 2019, after spotting N.M.S. at the laundromat again, defendant Kevin Perez Sandoval drove GLCs members to retrieve a gun and a change of clothes, then dropped one off so that he could sneak up to the fence and shoot N.M.S. multiple times. After the co-conspirators fled from this second scene, defendants Jose Rosales Juarez, who had surveilled N.M.S. on behalf of the clique, and Marvin Torres helped their fellow GLCS associates evade law enforcement.

After a three-week trial, a jury convicted defendants Cruz Moreno, Sandoval, Rosales Juarez, and Torres of conspiracy to commit violent acts in aid of racketeering, attempted murder in aid of racketeering activity, and conspiracy to

distribute cocaine and marijuana, among other crimes. Defendants do not challenge the sufficiency of the evidence supporting their convictions. Instead, they claim that the district court should have ordered a mistrial based on an alleged deficiency in witness translation and they seek a new trial based on a post-trial *Giglio* disclosure made by the government regarding its testifying gang expert.

Because neither of these claims is persuasive, the Court should affirm defendants' convictions and sentences.

## Issues Presented

1.   Did the district court abuse its discretion by denying defendants' motion for a mistrial based on the three discrete mistranslations of a witness' testimony?

2.   Did the district court abuse its discretion by denying defendants' motions for a new trial based on the post-trial disclosure of impeachment evidence relating to the government's gang expert that was not known to the prosecution at the time of trial?

## Statement of the Case

Defendants were convicted on March 17, 2022, following a three-week jury trial. JA3063–3067. Defendant Carlos Cruz Moreno was convicted of conspiracy to participate in a racketeering enterprise, conspiracy to commit murder in aid of racketeering activity, conspiracy to distribute cocaine and marijuana, attempted

murder in aid of racketeering activity, assault with a dangerous weapon in aid of racketeering activity, using and discharging a firearm during and in relation to a crime of violence, and possession with intent to distribute cocaine. JA3071–3072. Cruz Moreno was acquitted of Count Fourteen, possession of a firearm in furtherance of a drug trafficking crime. JA3072. Defendant Kevin Perez Sandoval was convicted of conspiracy to participate in a racketeering enterprise, conspiracy to commit murder in aid of racketeering activity, conspiracy to distribute cocaine and marijuana, attempted murder in aid of racketeering activity, assault with a dangerous weapon in aid of racketeering activity, and using and discharging a firearm during and in relation to a crime of violence. JA3074–3075. Defendant Jose Rosales Juarez was convicted of conspiracy to participate in a racketeering enterprise, conspiracy to commit murder in aid of racketeering activity, conspiracy to distribute cocaine and marijuana, and accessory after the fact. JA3078–3079. Defendant Marvin Torres was convicted of conspiracy to participate in a racketeering enterprise, conspiracy to commit murder in aid of racketeering activity, and conspiracy to distribute cocaine and marijuana. JA3076.

Thirty-seven witnesses testified for the United States, including the two victims of the attempted murders, E.P.A. and N.M.S. *See* JA866, JA2022. The investigation into defendants was led by agents from the Department of Homeland Security, Homeland Security Investigations ("HSI"). JA1890, JA2808. HSI

received support from local law enforcement, including officers from Prince William, Albemarle, and Fairfax Counties, and Manassas City. *See* JA486, JA755, JA806, JA906, JA961, JA919, JA1016, JA1025, JA1077, JA1622, JA2121, JA2663. Further, two FBI agents testified as to their limited involvement in the investigation. The first was Luis DeJesus, a member of the Cellular Analysis Survey Team, who "prepared maps from cell phone records." JA249, JA2299. The second was David Rivera, an agent on a gang and drug squad who assisted HSI with two interviews in the case, and reviewed the contents of defendant Sandoval's seized cell phone. JA2143, JA2145, JA1891, JA2160, JA2162.

The government called a gang expert, then-Sergeant Claudio Saa, to testify about MS-13's "history, structure, and organization." JA3303; *see also* JA3104–3130 (substance of Saa's direct examination). At the time, Saa worked for the Herndon Police Department ("HPD") and was a "well-regarded and accomplished law enforcement officer for more than two decades." JA3298. Saa based his expertise on his experience as a law enforcement officer investigating gangs, specifically interviews with MS-13 members, surveillance, and wiretap recordings. JA3086–3089, JA3091–3092. His testimony related to MS-13 in general; he did not investigate defendants, and did not know anything specific about the clique that defendants belonged to. JA3100, JA3140. Saa explained the history of MS-13, its rank structure and promotions, methods of operating (including recruitment,

violence, drug-dealing, and punishments), common iconography, and slang terms. JA3104–3130. Defense counsel questioned Saa at length about his qualifications and the basis and recency of his knowledge about MS-13. *See* JA3091, JA3094–3099, JA3131, JA3143–3146.

The government also called four cooperating MS-13 members or former members, all of whom echoed Saa's substantive testimony. To establish the racketeering enterprise, Edgar Blanco Torres testified about his experience as an MS-13 gang member in El Salvador and the United States. JA396–397, JA400–402. As an MS-13 member since he was 14, he testified about the gang's ranks, the roles and responsibilities of each rank, and the ways in which MS-13 operates, including gang nicknames, drug-dealing activity, clique meetings, dues, enforcement, and punishment. JA401–403, JA414–423. Further, Blanco Torres testified about violence carried out by the gang, including the killing of perceived gang rivals to increase prestige within MS-13. JA416–JA423. Finally, he testified about the gang's slang. JA422–423.

Similarly, Walter Argueta Amaya, a former GLCS member, testified about MS-13's reputation for committing crimes like extortion, theft, murder, and drug dealing. JA604. He explained MS-13's rank structure, responsibilities of each member rank, and the rules and punishments associated with membership. JA605, JA607, JA610–618, JA621, JA638–643. Amaya also described his understanding

5

of the same key slang terms used by MS-13 members. JA638–639. He testified about how MS-13 members and supporters scout for gang rivals, and what each rank is supposed to do when they see a gang rival. JA640. He also testified that the ultimate goal is to kill these gang rivals, and that an MS-13 member's rank increases for each such murder. JA640–641.

Cristian Martinez Sanchez, the former second-in-command of GLCS, testified about the gang's reputation for murders, drug-dealing, extortion, and kidnapping. JA1453–1454, JA1464, JA1466. Like the other cooperators, Martinez Sanchez explained in detail the MS-13 rank structure, the responsibilities of members and supporters, how MS-13 members achieve higher ranks, and how the gang operates and punishes its rule-breaking members. JA1464–1467, JA1471–1475. He also testified about his knowledge of certain slang terms used by the gang. JA1467–1470.

Lastly, Javier Bonilla testified not only about the gang's rank structure, drug-dealing, violence, and rules, JA2202, JA2209–2210, JA2218, but also about his personal involvement in the drug dealing activity and attempted murders with which defendants were charged. *See* JA2256–2267, JA2310–2337.

Extensive evidence corroborated the witnesses' testimony. This included wiretapped phone conversations, *see, e.g.*, JA2351–2352, text messages and pictures exchanged between co-conspirators, *see, e.g.*, JA2288–2292, video recordings, *see,*

*e.g.*, JA1239–1240, cell phone location data, SA26–30, SA49–55, and statements made by defendants themselves to law enforcement.

In particular, defendant Cruz Moreno explained to law enforcement the GLCS rank structure, and admitted he held a particular rank. JA1853–1855. He also admitted that he had heard the GLCS leader order a co-conspirator to murder E.P.A., and that he had driven E.P.A. and the attackers to a remote wooded area, drove around for a bit, then picked up the attackers—without E.P.A. JA1844–1853, JA1856–1869; SA34–37. Messages that Cruz Moreno exchanged with the GLCS leader showed his involvement in the gang's drug dealing activity, specifically cocaine. SA63–65.

Defendant Sandoval told law enforcement that he knew his co-conspirators were angry on the day that they attempted to murder N.M.S., and he drove his co-conspirators—including Bonilla—to and from the location where the attempted murder happened. JA2171–2173, JA2177–2184; SA58–59. He also admitted that he knew the co-conspirators fetched a change of clothes, that he assisted GLCS members on other occasions, and that his Facebook page featured his GLCS nickname, "Nocturno." JA2168, JA2175–2176, JA2183; SA58–59. Text messages and videos also showed that Sandoval sold cocaine on behalf of GLCS. SA71–72.

In a recorded interview played during trial, defendant Rosales Juarez admitted to law enforcement that his GLCS nickname was "Gears," and that he had assisted

N.M.S.'s shooter after the attempted murder, including by renting and paying for a hotel room for the co-conspirators to stay in and helping Sandoval exchange cars. *See* JA2724–2729; SA59–60. Before the attempted murder, he excitedly exchanged messages with the GLCS leader about killing N.M.S.; so passionately, in fact, that the GLCS leader commended Rosales Juarez's enthusiasm. SA43–45. Rosales Juarez was also intimately involved with GLCS's drug-dealing. SA68–71.

Lastly, defendant Torres admitted to law enforcement that his GLCS nickname was "Trance," he attended clique meetings, and paid dues. SA67. Other evidence showed that Torres took a photograph of N.M.S. identifying him as a gang rival, and sent it to others associated with GLCS. SA38, SA41–42. He also exchanged multiple messages with the GLCS leader using coded language to discuss killing gang rivals. SA39–42. Additionally, after N.M.S. was shot, Torres assisted the clique by surveilling police activity near the laundromat. SA54. Like the others, Torres also messaged the GLCS leader about selling drugs. SA65–66.

## A.    Translations.

Throughout the trial, the court provided two Spanish translators for defendants. *See, e.g.*, JA2067–2069. For Spanish-speaking witnesses, two additional Spanish translators interpreted their testimony, swapping with each other at short intervals. *See* JA2474.

Javier Bonilla, a former GLCS member and participant in both attempted

murders, testified on March 8, 9, and 10, 2022.  JA2200, JA2302, JA2568.  On March 8, Jose Lopez and Gregorio Ayala translated for defendants, and Manuel Prado and Shelley Bloomberg translated for the witnesses, including Bonilla. JA2067–2069.  On March 9, Lopez and Ayala translated again for defendants, and Prado and Victoria Dopazo translated for Bonilla, whose testimony had continued. JA2294–2296.

Shortly after 4:00 pm on March 9, Juror 41 provided the trial judge with a note expressing concern that "the translation was really poor today," "[t]he male translator was the worse [sic]," and that she "[didn't] think it always reflected the testimony."  JA2452, JA2503.  Defendants moved for a mistrial.  JA2463.

When questioned by the trial judge about her note, Juror 41 stated that she did not "know if it was anything material," and that her concerns were confined to "today" and "yesterday … a little bit," and only relating to Bonilla's testimony. JA2480, JA2483–2484.  She specifically recalled that she was confused by the translation of Bonilla's testimony regarding what happened with the backpack containing the gun on April 20, 2019; by Prado once saying E.P.A.'s name instead of N.M.S.'s name when Bonilla was testifying about "who was by the fence" when N.M.S. was shot; and by defense counsel mixing up the names of Kevin Castro (also known as "Buer")—a co-conspirator—and defendant Kevin Sandoval on cross-examination.  JA2479–2485.

After Juror 41 returned to the jury room, Interpreter Lopez volunteered his opinion to the court that "the interpretation has been slightly shy of catastrophic." JA2486. Lopez specified that he took issue with Interpreter Prado's translation only "with respect to this witness [Bonilla]," JA2487, even though Lopez was also present on March 7 and 8 for the testimony of N.M.S., for whom Prado also translated. *See* JA2014–2016; JA2067–2070; JA2488. When pressed for specifics, Lopez alleged one instance of "flipping of meaning from the positive to the negative or vice versa," but could not recall the actual context. JA2488. Ultimately, he could only identify that Prado had translated Bonilla's sentence, "A machete could be used to split a coconut open," as, "A machete was used to open boxes." JA2534–2535.

The trial court also questioned the other two interpreters present on March 9, Ayala and Dopazo. Ayala interpreted on three other days—March 1, 7, and 8— during which Prado translated Spanish-language witness testimony, and did not raise any concerns as to Prado's accuracy. JA1393–1395; JA2014–2016; JA2067–2069; JA2501–2502. Dopazo, who had not translated during the trial prior to March 9, also confirmed that she perceived no material mistranslations, and "would have brought it to [the court's] attention" if she had. JA2499–2500.

Juror 66, who admitted less fluency and whom the court questioned the morning of March 10, told the court that he only "notice[d] certain words that were not consistent," that "the witness … had to correct the interpreter at times," and that

"[i]t was probably just yesterday [the same day Juror 41 identified] that I noticed." JA2511–2512.  As far as specifics, Juror 66 only remembered a mistranslation of a username—javier_bonill13—as "3" instead of 13, which Bonilla corrected. JA2511.

The trial court subsequently found that there was "no identification of any widespread issues," and that "with respect to these specific examples, they relate to very discrete issues.  In fact, a very limited number of identified issues pertaining to one interpreter, who was spelled during various portions of the testimony with respect to one witness' testimony on one day." JA2541.[1]  The court found that none of "[t]hese limited instances … raise issues in a constitutional sense that would infect the entire fairness of the trial or really raise grave doubt as to the accuracy of all the other interpretations."  JA2542.  The court also noted that defense "counsel has had a lot of information about the statements of these witnesses before they testified and there have been no issues raised prior to this time with respect to any other witness on any other day." JA2542.  The court denied defendants' motion for a mistrial, but permitted defense counsel to "reexamine Mr. Bonilla as to those limited areas identified by Juror 41, the backpack or the identity of people behind the fence."

---

[1] "Spelled" means that approximately every 15 minutes, the two interpreters for the witness would swap off translating in order to give them both time to rest during lengthy testimony.  *See* JA2474.

JA2543.  Thereafter, Bonilla's testimony continued on March 10, with Lopez, Ayala, Dopazo, and another interpreter, Maria Horvath, translating.  JA2504–2506.

## B.  Post-trial impeachment evidence related to Claudio Saa.

Before trial, on December 16, 2021, Saa wore his HPD uniform to attend a publicized event at the Salvadoran embassy in Washington, D.C., where he "gifted gun holsters valued at $29,000 to the National Civil Police of El Salvador ("PNC")." JA3298.  Following Saa's attendance of the Salvadoran embassy event, HPD referred Saa to the FBI for potentially acting as an unregistered foreign agent, in violation of 18 U.S.C. § 951 ("FARA").  JA3298, JA3389.

On January 6, 2022, members of one of the FBI's public corruption squads met with HPD and opened an assessment into Saa.  JA3262.  On May 27, 2022, nearly two months after the verdict in this case, the FBI interviewed Saa for the first time.  JA3262.  The FBI also interviewed the individual from whom Saa obtained the holsters that he donated to the PNC.  *See* JA3298–3299.  This individual, who worked for the U.S. Postal Inspection Service, had gifted Saa the holsters several years prior.  JA3298.  "In the ensuing years, [Saa] attempted to donate them to law enforcement agencies in Northern Virginia, but he was unable to do so, in part because the holsters were largely incompatible with the firearms used by local agencies."  JA3298–3299.  Finding no evidence of criminal wrongdoing, the FBI closed its assessment.  JA3298.

After the FBI closed its assessment, HPD continued to investigate Saa's conduct as it related to HPD's policies. JA3298. The department was further concerned by Saa's close personal relationship with Commissioner Funes, "a high-ranking police commissioner who has been accused of having ties to Salvadoran intelligence and being involved in corruption, drug trafficking, and executions." JA3299. HPD took issue with Saa having made several personal trips to El Salvador, during which he once visited an FBI office in El Salvador and implied he was there for work when he was actually in-country on vacation. JA3299, JA3388. Ultimately, HPD found that Saa had "violated several HPD policies, including insubordination and improperly using his police uniform." JA3299.

"On July 15, 2022, while HPD's investigation was still pending, Saa resigned" from the department. JA3299. On August 25, 2022, the government notified defendants about the allegations related to Saa. JA3337–3338. And on August 29, 2022, the government produced to defendants the FBI reports related to Saa. JA3262.

On August 30, 2022, HPD produced its final memorandum, written by Captain Steven Pihonak, reflecting his characterization of the internal investigation and Saa. JA3390; *see also* Def. Br. 31. HPD requested that the Virginia Department of Criminal Justice Services ("VDCJS") decertify Saa as a law enforcement officer, and, on October 17, 2022, the VDCJS Executive Committee of the Criminal Justice

Services Board sustained Saa's decertification.  JA3299.

On November 25, 2022, the government "produced the appeal file from the VDCJS, together with an Addendum to Decertification Documentation."  JA3262–3263.  The government also provided unredacted copies of this same information for the trial court's *in camera* review.  JA3193, JA3297.

### C.    Procedural history

After the government's post-trial disclosure of information relating to Saa, defendant Torres filed several motions for subpoenas under Federal Rule of Criminal Procedure 17.  JA3194–3240.  Following briefing on the matter, on February 8, 2023, the trial court denied the issuance of the post-trial subpoenas, and permitted defendants to file motions for a new trial based on newly discovered evidence.  JA3261–3269.  On March 17, 2023, defendants filed their joint motion for a new trial, which the government opposed.  JA3270–3294, JA3385–3415.

On April 21, 2023, the trial court denied defendants' motion for a new trial.  JA3295–3306.   The court assumed, "without finding, that the Government suppressed evidence related to the HPD and FBI inquiries" for purposes of resolving the motion.  JA3301.  The court emphasized that "[t]his assumption should not be construed as a finding or suggestion in any way of wrongdoing by Government counsel."  JA3301 n.6.  Further, the court had "no reason to doubt Government counsel's representations" about when they learned of the HPD/FBI inquiries.

JA3301 n.6. But the court "assume[d] *arguendo* that suppression occurred in lieu of granting Defendants' Motion for Issuance of Subpoenas." JA3301 n.6.

First, the district court concluded that defendants were not entitled to a new trial under Rule 33 because "evidence of Saa's relationship with the PNC and Commissioner Funes, and the HPD and FBI inquiries into it, are highly unlikely to produce an acquittal upon a new trial." JA3304. The court reasoned that "Saa's testimony did not relate to the Defendants specifically and was instead largely limited to the history, structure, and organization of MS-13 generally." JA3303. Further, "Saa was by no means the Government's star witness, with other cooperators also testifying about MS-13 culture and practices and the GLCS clique's organization." JA3303. Accordingly, "the evidence presented at trial— which . . . included phone records, Defendants' own statements, and the statements of the Government's cooperating witnesses—was sufficient to support Defendants' convictions even without Saa's testimony." JA3303. The court also rejected defendant's argument "that the new evidence uncovers a conspiracy between MS-13, Funes, and Saa to convict these Defendants" as "implausible, unsupported by the new evidence," and unlikely to "produce an acquittal." JA3303.

Second, the district court determined that defendants were not entitled to a new trial based on the alleged *Brady* violation. The court reiterated that "not only is it unlikely that the evidence would produce an acquittal, but there is 'no reasonable

probability of a different result.'" JA3304. "Even excluding Saa's testimony entirely, there was sufficient evidence to convict Defendants based on, *inter alia*, phone records, testimony of cooperating witnesses, and Defendant's own statements and admissions to law enforcement." JA3305. Therefore, the "evidence related to Saa" did not "undermine the confidence in the outcome of the trial." JA3304–3305. The court also rejected defendants' Confrontation Clause argument, reasoning that any error was harmless beyond a reasonable doubt because Saa "did not provide any direct or other crucial evidence relating to the underlying offenses," and "other cooperating witnesses also testified to MS-13's structure and organization." JA3305.

On May 17, 2023, defendants were sentenced. JA3307–3332. All four defendants timely noted their appeals.[2] JA3333–JA3336.

This appeal followed.

## Summary of Argument

The trial court did not abuse its discretion when it denied defendants' motion for a mistrial based on a handful of immaterial mistranslations that were limited to one day of one witness' testimony. The record does not support defendants' claim

---

[2] There appears to be a blank notice of appeal in the joint appendix. JA3305. The government believes this reflects Rosales Juarez's notice of appeal, properly filed on the docket on May 24, 2023.

of widespread translation errors. Instead, the few mistranslations—made by Interpreter Manuel Prado on one day, for one witness' testimony—do not cast grave doubt on the accuracy of the translations. Moreover, these mistranslations were not material to the case against defendants, or to the translation of the witness' testimony. Regardless of a few hiccups, Prado accurately conveyed the meaning of the witness' testimony, and defendants received a fair trial.

Likewise, the trial court did not abuse its discretion by denying defendants' post-trial motions for a new trial on the basis of post-trial impeachment evidence that the government disclosed about gang expert Claudio Saa. First, defendants are not entitled to a new trial under Federal Rule of Criminal Procedure 33 because the evidence is merely impeaching, immaterial, and would not have probably produced an acquittal. Second, defendants are not entitled to a new trial pursuant to *Brady*. As the district court correctly concluded, the post-trial impeachment evidence was not material. Saa was not a key witness, and his substantive testimony was corroborated by multiple other witnesses and statements by defendants themselves. Defendants were not prejudiced by their inability to turn Saa's testimony into a miniature credibility trial, and any deprivation of their ability to do so was harmless. Alternatively, the Court can affirm the denial of a new trial because the government did not suppress this post-trial evidence, which only a few people knew at the time of trial, none of whom were investigators or agents of the prosecution team.

Accordingly, this Court should affirm the judgment.

## Argument

### I.     The district court did not abuse its discretion in denying a mistrial based on immaterial mistranslations of a witness's testimony.

Defendants maintain that the district court should have declared a mistrial because Prado's translation of Bonilla's testimony on March 9, 2022, violated defendants' rights to due process and confrontation.  Def. Br. 16–20.  "A district court denies a criminal defendant due process where the accuracy and scope of a translation at a hearing or trial is subject to grave doubt."  *United States v. Leiva*, 821 F.3d 808, 820 (7th Cir. 2016) (internal quotation marks omitted).  Limitations on the defense case "may implicate the confrontation right when the defendant is prevented from pursuing a meaningful line of inquiry."  *United States v. Barahona*, 606 F. App'x 51, 65 (4th Cir. 2015) (citing *United States v. Williams*, 445 F.3d 724, 740 (4th Cir. 2006)).

Generally, the "standard for the adequate translation of trial proceedings requires continuous word for word translation of everything related to the trial a defendant conversant in English would be privy to hear."  *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir. 1990); *see also United States v. Long*, 301 F.3d 1095, 1105 (9th Cir. 2002); *United States v. Huang*, 960 F.2d 1128, 1135 (2d Cir. 1992).  But "minor deviations from this standard will not necessarily contravene a defendant's constitutional rights."  *Joshi*, 896 F.2d at 1309; *see also Long*, 301 F.3d

18

at 1105; *Huang*, 960 F.2d at 1135–36. In other words, "[a]n interpretation need not be verbatim to be constitutionally sound if it 'reasonably conveys the intent or the idea of the thought spoken.'" *United States v. Garcia*, 948 F.3d 789, 802 (7th Cir. 2020) (quoting *United States v. Gonzalez*, 319 F.3d 291, 296 (7th Cir. 2003)).

District courts in this Circuit have applied "a presumption of propriety" to a court interpreter's "performance of his or her official duties." *Michel v. United States*, 849 F. Supp. 2d 649, 657 (W.D. Va. 2012), *appeal dismissed*, 479 F. App'x 534 (4th Cir. 2012) (per curiam); *see also Castrejon v. United States*, No. 5:19-cr-111-D-2, 2022 WL 4099458, at *6 (E.D.N.C. Sept. 7, 2022); *Beyle v. United States*, 269 F. Supp. 3d 716, 728 (E.D. Va. 2017), *appeal dismissed*, 740 F. App'x 285 (4th Cir. 2018) (per curiam). The trial court "must be given wide discretion in evaluating the adequacy of the interpreter's efforts," *United States v. Mata*, No. 98-4843, 1999 WL 427570, at *3 (4th Cir. June 25, 1999) (per curiam) (internal quotation marks omitted), and an appellate court "generally view[s] interpreter problems within the context of an entire trial," *Long*, 301 F.3d at 1105. "The ultimate question is whether any inadequacy in the interpretation made the trial fundamentally unfair." *Mata*, 1999 WL 427570, at *3 (quoting *Valladares v. United States*, 871 F.2d 1564, 1566 (11th Cir. 1989) (Powell, J.)); *see also Garcia*, 948 F.3d at 802; *Huang*, 960 F.2d at 1136; *Joshi*, 896 F.2d at 1309.

The Court reviews alleged constitutional violations de novo. *See, e.g., United*

*States v. Saint Louis*, 889 F.3d 145, 152 (4th Cir. 2018) (Due Process Clause); *id.* at

156 (Confrontation Clause); *see also United States v. Dixon*, 481 F. App'x 806, 810

(4th Cir. 2012) (per curiam) (reviewing denial of motion for mistrial based on

Confrontation Clause challenge).  At the same time, the "denial of a defendant's

motion for a mistrial is within the sound discretion of the district court and will be

disturbed only under the most extraordinary of circumstances." *United States v.

Dorlouis*, 107 F.3d 248, 257 (4th Cir. 1997).  Accordingly, the Court reviews the

ultimate decision to deny a mistrial for an abuse of discretion. *See, e.g.*, *United

States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008).

Viewed in the context of the entire trial, Prado's translations of a single

witness's testimony on one day of a three-week trial did not violate defendants'

constitutional rights.  The record does not show pervasive translation errors, and the

isolated issues defendants identified did not create grave doubt as to the accuracy of

the translations.  Because the handful of mistranslations were immaterial, they did

not render the trial fundamentally unfair.  Therefore, the district court did not abuse

its discretion in denying a mistrial.

## A.   The record does not reflect widespread error in Prado's translations.

Defendants contend that "the pervasive flawed interpretation" constitutes

"structural error."  Def. Br. 21.  "Structural errors are errors that affect the 'entire

conduct of the [proceeding] from beginning to end.'" *Greer v. United States*, 593

U.S. 503, 513 (2021) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)). The Supreme Court has "found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.'" *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). "The 'highly exceptional' category of structural errors includes, for example, the 'denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt.'" *Greer*, 593 U.S. at 513 (quoting *United States v. Davila*, 569 U.S. 597, 611 (2013)). By contrast, "discrete defects in the criminal process . . . are not structural because they do not '*necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" *Id.* (quoting *Neder*, 527 U.S. at 9).

The record does not support defendants' claims of "pervasive, flagrantly flawed interpretation" of witness testimony at trial. Def. Br. 17; *see Garcia*, 948 F.3d at 802 (noting that the defendant "has the burden to support his claim of widespread error" in the interpretations of witness testimony). Defendants do not point to any specific testimony by Bonilla—or any other Spanish-speaking witness—that was flawed. Nor can they, because the record reveals no material surprises in Bonilla's testimony that appear to have been the product of mistranslation, let alone any widespread or consistent issues. By the time any concerns were raised, Bonilla was on his second day of testimony. JA2538–2539.

Juror 41 only alleged mistranslations "today" and "yesterday … a little bit," and only relating to Bonilla's testimony. JA2483–2484. Juror 66 only "notice[d] certain words that were not consistent," that "the witness … had to correct the interpreter at times," and that he had only noticed these issues on the same day as Juror 41. JA2511–2512. Interpreter Lopez specified that he took issue with Prado's translation only "with respect to this witness [Bonilla]," JA2487, even though Lopez was also present on Day 10 of trial for the testimony of Norman Medina Sanchez, for whom Prado also translated. *See* JA2067–2069; JA2488. Further, Interpreter Ayala was present for three other days during which Prado translated witness testimony, and did not raise any concerns as to translation accuracy when questioned by the trial court. JA1393–1394; JA2014–2015; JA2067–2068; JA2501–2502. Interpreter Dopazo also confirmed that she perceived no material mistranslations, and "would have brought it to [the court's] attention" if she had. JA2499–2500. Accordingly, no pervasive translation error deprived defendants of their rights to due process and confrontation. *See, e.g.*, *Garcia*, 948 F.3d at 802–03 (holding that no widespread error deprived the defendant of due process where the court of appeals did "not see evidence" of widespread error).

**B.    The few identified mistranslations do not create grave doubt as to the accuracy or scope of the translation at trial.**

Defendants focus on only two translation issues identified by Juror 41: (1) the translation of Bonilla's testimony regarding what happened with the backpack

containing the gun; and (2) Prado once saying E.P.A.'s name instead of N.M.S.'s name when Bonilla was testifying about "who was by the fence" when N.M.S. was shot. Def. Br. 18–19. Neither discrepancy casts grave doubt on the translations.

Bonilla's testimony regarding the placement of the backpack—which he consistently testified belonged to him—was ultimately clear. The topic did not even come up during the government's questioning. Instead, on cross-examination, Bonilla testified that the backpack was in the back seat area of the car, on the floor. JA2372. When defense counsel asked later whether the backpack was in the middle back seat specifically, where Bonilla was sitting, Bonilla responded, "It wasn't there," but that "[s]omebody in the back had it," and that "[w]hen the police came, they moved us." JA2372–2373. If there was any confusion, it could not have been material to the translation, given that Bonilla clearly testified twice in response to two distinct questions that the backpack was in the back seat area. JA2372–2373; *see also Garcia*, 948 F.3d at 803–804 (holding that instances of a witness' alleged mistranslated testimony presented "no constitutional problem" when there were no "significant interpretation errors").

As for Bonilla's testimony regarding who was at the fence when N.M.S. was shot, the record demonstrates that any minor confusion was ultimately resolved. Bonilla consistently testified that it was Buer who walked through the woods to shoot N.M.S. from behind the fence by the laundromat; he never alleged that anyone

else—let alone any of the defendants—was present with Buer. *See, e.g.*, JA2331, JA2416, JA2423–2424. It appears the translation possibly confused Bonilla twice during cross-examination, but both times, he clarified immediately—and consistently—that Buer was alone at the fence for the shooting. JA2416; JA2423–2424. Again, given multiple independent opportunities for mistranslation, Bonilla's testimony never changed. His meaning was accurately conveyed, regardless of any momentary "hiccups" with the translation. *See Garcia*, 948 F.3d at 802.

Defendants do not identify any other specific translation issues in the fact or argument sections of their brief. *See* Def. Br. 12–21. Therefore, defendants have waived any argument as to Prado's other alleged mistranslations. *See, e.g., United States v. Taylor-Sanders*, 88 F.4th 516, 525 n.5 (4th Cir. 2023) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue.") (quoting *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017)). Even if the Court considers the other alleged mistranslations, the translations remained constitutionally sound.

At trial, Juror 41 noted confusion over defense counsel mixing up the names of Kevin Castro—a co-conspirator—and Kevin Sandoval—a defendant—on cross-examination. JA2479–2485. But any confusion was due to a simple mistake by defense counsel, not an erroneous translation by Prado. Likewise, Juror 66

described a mistranslation of the last digit of a username—javier_bonill13—as "3" instead of 13. JA2511. But Bonilla corrected that mistake during his testimony. JA2511.

Although Lopez opined that "the interpretation ha[d] been slightly shy of catastrophic," JA2486, the only issue he identified was that Prado had translated Bonilla's statement, "A machete could be used to split a coconut open," as, "A machete was used to open boxes," JA2534–2535. The gist of Bonilla's unprompted comment—that he could have had an innocuous reason for having a machete, which he agreed was his—was accurately conveyed, regardless of exactitude. JA2395–2396; *see also Leiva*, 821 F.3d at 820 (holding that "while the transcript evidences hiccups in the interpreter's translation of [the defendant's] testimony," "[t]he translation of his testimony conveyed his story."). Indeed, Prado's full translation of Bonilla was, "You could maybe use the machete for any number of things, maybe to open boxes." JA2396.

"Mere interpretation 'hiccups' do not create grave doubt." *Garcia*, 948 F.3d at 802. After thoroughly investigating the alleged mistranslations, the trial court accurately found that there was "no identification of any widespread issues," and that there were only "a very limited number of identified issues pertaining to one interpreter, who was spelled during various portions of the testimony with respect to one witness' testimony on one day." JA2541. Because the mistranslations in this

case were extremely limited and specific to one day of Bonilla's testimony, there can be no "grave doubt" as to the accuracy of the translations at trial. *See Garcia*, 948 F.3d at 802.

### C. Because the few identified mistranslations were immaterial, the trial was fundamentally fair.

Viewed in the context of the entire proceedings, any mistranslations did not render the trial fundamentally unfair. *See, e.g.*, *Mata*, 1999 WL 427570, at *4 (upholding denial of motion for new trial where there was "no particularized showing that the allegedly deficient translation prejudiced [the defendant] in any way"); *see also Long*, 301 F.3d at 1105 (holding that the district court did not abuse its discretion in denying a mistrial where "the government had other evidence and witnesses beside [the witness requiring an interpreter] to support its case against" the defendant); *United States v. Gomez*, 908 F.2d 809, 811 (11th Cir. 1990) (holding that, although the translation "was plainly improper," the interpreter's conduct did not "render[] the entire trial 'fundamentally unfair'" because "the evidence against the defendants was, in all other respects, overwhelming").

When questioned by the trial court, Juror 41, Dopazo, and Ayala explicitly stated that they perceived no material mistranslations. JA2480, JA2499–2502. Similarly, Juror 66 could not recall any "specifics" regarding any translation issues "in terms of meaning." JA2512. It is clear that they were correct. As the trial court found, none of the few specific, identified mistranslations were material to Bonilla's

testimony, or even relevant to defendants' convictions. *See* JA2542; *Garcia*, 948 F.3d at 802–804. Cruz Moreno was acquitted of possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i) (Count 14), which was the only relevance of the backpack. *See* JA981 (testimony of Sergeant Michael Lentz that "the only item of note" in the backpack was the pistol). And the identity of the person who was at the fence when N.M.S. was shot had no bearing on defendants' culpability for their respective roles in the attempted murder. That none of the identified mistranslations were material to Bonilla's testimony or defendants' convictions further underscores the fundamental fairness of the trial. *Cf. Huang*, 690 F.2d at 1136 (concluding that the trial court abused its discretion in granting a mistrial as to two defendants where interpreter was not court-certified and summarized portions of testimony because there were no "material" issues and "it is highly unlikely that there could have been a reversal of any convictions of [the defendants]").

Prado's translations of Bonilla's testimony did not violate defendants' rights to due process and confrontation. The claim by defendants' counsel that they could not properly assess Bonilla's testimony because of the language barrier is meritless, *see* Def. Br. 19–20, because counsel possessed transcripts of Bonilla's prior testimony and reports of his proffers with law enforcement, and in fact, used those documents extensively to cross-examine him. *See, e.g.*, JA2398–2401

(cross-examining Bonilla with an agent's notes of a prior proffer); JA2425–2433 (cross-examining Bonilla with grand jury testimony); JA2435–2436 (cross-examining Bonilla with a report of a prior proffer). As the trial court observed, given defense counsel's familiarity with the witness' extensive prior statements, had one of Bonilla's translated responses—or the responses of any other translated witness—unexpectedly changed in a way that *materially affected the case*, it is likely counsel would have noticed. JA2542.

Moreover, after Juror 41 identified her concerns with Prado's translations, the district court expressly permitted defense counsel to "reexamine Mr. Bonilla as to those limited areas identified by Juror 41, the backpack or the identity of people behind the fence." JA2543. Bonilla's testimony continued, with Lopez, Ayala, Dopazo, and another interpreter, Maria Horvath, translating. JA2504–2506. Thus, Prado's isolated mistranslations did not impede defendants' ability to confront Bonilla.

On this record, it is clear that defendants received a fair trial and were not deprived of due process. There is no evidence of widespread mistranslation, and despite the handful of minor "hiccups" with Prado's translation of Bonilla's testimony, "[t]he translation of his testimony conveyed his story" with no material issues. *See Leiva*, 821 F.2d at 820; *Garcia*, 948 F.3d at 802–804. Therefore, the district court did not abuse its discretion in denying defendants' motion for a mistrial.

## II. The district court did not abuse its discretion in denying a new trial based on the post-trial disclosure of impeachment evidence.

"[T]he district court's denial of a motion for a new trial" is reviewed "under an abuse of discretion standard." *United States v. Wolf*, 860 F.3d 175, 189 (4th Cir. 2017) (citations omitted). The district court's factual findings are reviewed for clear error, while legal determinations are reviewed de novo. *Id*. On appeal from the denial of a new trial motion, the Court is "not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record." *United States v. Ali*, 991 F.3d 561, 571 (4th Cir. 2021) (internal quotation marks omitted).

At the threshold, defendants conflate the requirements for a new trial based on newly discovered evidence under Federal Rule of Criminal Procedure 33 with the legal test for whether a *Brady* violation necessitates vacating a conviction. *See* Def. Br. 28; Fed. R. Crim. P. 33. Neither framework entitles defendants to a new trial, and the district court did not abuse its discretion by denying defendants' motion for a new trial under both tests.

### A. Defendants were not entitled to a new trial under Rule 33 because the evidence is merely impeaching, immaterial, and would not have probably produced an acquittal.

Defendants fail to meet the standard for a new trial under Rule 33, which requires that:

(a) the evidence [is], in fact, newly discovered … ; (b) facts [are]

29

alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on [is not] merely cumulative or impeaching; (d) [the evidence is] material to the issues involved; and (e) [the evidence is] such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010) (citing *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993)). Defendants must meet all five conditions to satisfy Rule 33. *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989) ("Unless the answer to each of [the five factors] is affirmative, a new trial is not appropriate.").

To the extent that defendants assert that Saa's close relationship with Funes and the PNC, specifically, is newly discovered evidence under Rule 33, *see* Def. Br. 30, these facts were easily discoverable before trial and therefore do not meet the first requirement. *See* JA3301 n.5; *see also Wolf*, 860 F.3d at 190 (upholding trial court's finding that evidence was not "newly discovered" and the defendant "could not show that he exercised diligence in uncovering the documents"). As the trial court found, "the event at the Salvadoran embassy appeared on social media and the press, and [Saa's] connection to the PNC was apparent based on … his Facebook page and curriculum vitae." JA3301 n.5. As a result, with respect to this particular aspect of the FBI reports relating to Saa, HPD memoranda, and records of interviews conducted by HPD (the "Saa Materials"), defendants fail to establish that it is new evidence under Rule 33. *See Wolf*, 860 F.3d at 190; *Robinson*, 627 F.3d at 948.

Defendants essentially concede that the Saa Materials, HPD's referral of Saa to the FBI, and the FBI's preliminary assessment of Saa are solely impeaching evidence, thereby dooming their Rule 33 argument from the start.[3] *See* Def. Br. 29; *Robinson*, 627 F.3d at 948. It is well-established that impeachment evidence does not merit a new trial under Rule 33 unless it impeaches "the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed." *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993) (citation omitted); *Ali*, 991 F.3d at 571 (holding that impeachment evidence did not warrant a new trial because it "merely calls into question the co-defendants' honesty on an issue orthogonal to the defendant's guilt"); *Robinson*, 627 F.3d at 948–949 (holding that evidence of testifying officers' substantiated prior misconduct unrelated to the case was impeachment evidence and did not warrant a new trial). Here, Saa was one of over 30 government witnesses. His general testimony about MS-13—which did not concern defendants' conduct in this case—was corroborated by several MS-13 members, including two GLCS members, and defendants' own statements to law enforcement. Like in *Robinson*, Saa's "misconduct … did not

---

[3] The trial court contemplated one "implausible" argument defendants could have asserted that, in the court's view, would not be impeachment evidence. JA3302. However, defendants do not raise this argument on appeal, and instead repeatedly refer to the Saa Materials as impeaching. *See, e.g.*, Def. Br. 29–30, 37, 39.

relate to [defendants'] case or to the truth-finding function of the criminal proceeding." 627 F.3d at 949. Thus, under their own argument, defendants are not entitled to a new trial under Rule 33. *See Chavis*, 880 F.2d at 793.

Additionally, the Saa Materials are immaterial under Rule 33. *See Robinson*, 628 F.3d at 949–950. The trial court plumbed the depths of "plausibility" to hazard that Saa's relationship with Funes could be material to an unsubstantiated theory that Saa, Salvadoran authorities, and MS-13 were somehow working together to convict defendants. JA3302. But because these are, in the trial court's words, "highly speculative … posited conspiracy theories," it is evident that the Saa Materials were not, in fact, material to the issues at trial. *See* JA3303. Instead, this case is akin to *Robinson*, where this Court deemed it immaterial under Rule 33 that four law enforcement officers who had "played only bit parts" in the investigation into the defendant were subsequently dismissed or resigned from their positions for misconduct unrelated to the investigation itself. 627 F.3d at 946–947, 950. Saa's testimony—and any potential *additional* impeachment of it—was even less material compared to the four officers in *Robinson*, as he never participated in the investigation into defendants and had no evidence about them specifically. *See id*.; JA3100–3101, JA3140. That the trial court had to revert to "conspiracy theories" to even conceive of a hypothetical material relevance for the Saa Materials—"thin as it may be"—indicates how truly immaterial they are and would have been. *See*

JA3303.

Lastly, the Saa Materials would not have probably produced an acquittal at trial. *See Robinson*, 627 F.3d at 950. Indeed, the trial court found this factor dispositive, because Saa was "by no means the Government's star witness," and his testimony was "relatively limited and contextual." JA3303–3304. Certainly "[e]vidence that [Saa] engaged in wrongful conduct unrelated to [defendants'] case would do little to undermine" an investigation that Saa never participated in. *See Robinson*, 627 F.3d at 950. The evidence against defendants was "overwhelming" and consisted of voluminous co-conspirator and victim testimony, cell phone geolocation data, wiretapped phone conversations, text messages, photographs, videos, and defendants' own statements—none of which involved Saa. *See id.* at 950–951; *Ali*, 991 F.3d at 571. "The trial court had the best vantage point in deciding" whether further impeachment of Saa—"or even the absence of Saa's testimony entirely"—would have affected the trial in any meaningful way. *See Robinson*, 628 F.3d at 950; JA3303–3304. And in so deciding, the trial court correctly found that, no matter the angle, the Saa Materials were "highly unlikely to produce an acquittal upon a new trial." JA3303–3304.

Defendants nonetheless claim that, armed with the Saa Materials, they would have "engage[d] in a withering cross-examination of Sergeant Saa *before calling his superiors and the FBI agents investigating him for a brutal direct examination*."

Def. Br. 41 (emphasis added).  But, as this Court observed:

> Misconduct evidence like this, which involved witnesses in [the defendant's] case but did not relate to those witnesses' investigation of that case, is likely to push the parties toward miniature credibility trials and to cut into the limits the Rules of Evidence place on information about diversionary and subsidiary issues.

*Robinson*, 627 F.3d at 949 (citing *Custis*, 988 F.2d at 1359 n.1; Fed. R. Evid. 403; Fed. R. Evid. 608(b)); *see also Ali*, 991 F.3d at 571 ("We cannot countenance 'fishing expeditions into the backgrounds of witnesses and insubstantial Rule 33 motions resulting therefrom…'").  By defendants' own admission, they would have attempted to derail the actual trial into a "miniature credibility trial" focused exclusively on Saa, stemming from incidents completely unrelated to the investigation into or case against defendants.  *See Robinson*, 627 F.3d at 949.  Doing so would inarguably confuse the issues, mislead the jury, unduly delay the trial, and waste time.  Fed. R. Evid. 403.  This is especially so because the FBI assessment was ultimately determined to be unfounded.  JA3299.  Had defendants succeeded on their Rule 33 claim, it would have "deprive[d] witnesses of a decent sense of closure and undermine[d] the finality of criminal proceedings to an unacceptable degree." *Robinson*, 627 F.3d at 949.  This Court has refused to "countenance" such sideshows in the past, and it should refuse to do so again here.  *Id*.

Accordingly, the trial court did not abuse its discretion in denying defendants' motion for a new trial under Rule 33.

**B.**   **Defendants were not entitled to a new trial under *Brady* because the government did not suppress the post-trial evidence relating to Saa and the evidence is not material.**

To prevail on a *Brady* claim, defendants

> must prove (1) that the undisclosed evidence was favorable to [them], either because it was exculpatory or had impeaching value; (2) that the state had the materials and failed to disclose them, "either willfully or inadvertently"; and (3) that the evidence was material to the defense, *i.e.*, "prejudice must have ensued."

*Moseley v. Branker*, 550 F.3d 312, 318 (4th Cir. 2008) (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999)).   "[T]he question is whether 'the favorable evidence,' 'considered collectively,' 'could reasonably be taken to put the whole case in such a different light as *to undermine confidence in the verdict*.'"   *United States v. George*, 95 F.4th 200, 209 (4th Cir. 2024) (citing *United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021)).

**1.**   **The post-trial impeachment evidence about Saa is not material under *Brady*.**

The district court assumed, for purposes of resolving the motion, that "the Government suppressed evidence related to the HPD and FBI inquiries," JA3301, but nonetheless concluded that defendants failed to satisfy *Brady*'s materiality requirement, JA3304–3305.   As set forth *infra*, the government maintains that it did not suppress this evidence.   Regardless, the Court should affirm because there is no reasonable probability that any information about Saa disclosed after trial would have produced a different result had it been available to defendants at trial.

"[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitney*, 514 U.S. 419, 436–437 (1995). Instead, *Brady* requires that the undisclosed evidence be material; that is, "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Strickler v. Greene*, 527 U.S. 263, 289–290 (1999) ("[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'") (citing *Kyles*, 514 U.S. at 435).

As the trial court correctly determined, "there is 'no reasonable probability of a different result' … [and] the nature of that evidence does not undermine the confidence in the outcome of the trial." JA3304–3305. "Even excluding Saa's testimony entirely, there was sufficient evidence to convict defendants based on, *inter alia*, phone records, testimony of cooperating witnesses, and defendants' own statements and admissions to law enforcement." JA3305.

The trial court's conclusions are well-supported. As an initial matter, "Defendants do not allege that any of Saa's testimony was false." JA3303; Def Br. 30. Accordingly, "their argument thus does not align with the circumstances in which [this Court] and other courts have held that an investigating officer's own

misconduct cast sufficient doubt on the case against the defendant so as to warrant a new trial." *United States v. Banks*, 104 F.4th 496, 510 (4th Cir. 2024) (citing *United States v. Fisher*, 711 F.3d 460, 466 (4th Cir. 2013)). After all, several MS-13 members—including three GLCS members, one of whom (Bonilla) actually participated in both attempted murders—and the recorded statements of defendants also corroborated Saa's testimony. *See* JA3303.

Instead, impeachment is the only use defendants could make of the post-trial information regarding Saa. But as the trial court found, "Saa was by no means the Government's star witness, with other cooperators also testifying about MS-13 culture and practices and the GLCS clique's organization." JA3303. As this Court has previously held, "when the Government's case does not depend on a particular government witness, then undisclosed information that would impeach that witness is immaterial as it does not create a reasonable probability of a different result at trial." *Banks*, 104 F.4th at 511 (citing *Strickler*, 527 U.S. at 292–296). Moreover, "both this Court and [its] sister circuit courts have recognized under similar circumstances that the materiality requirement is not satisfied when a law enforcement officer's misconduct is tangential to the evidence establishing a defendant's own culpability." *Id*. (citations omitted). There is nothing to distinguish the information about Saa from other cases where this Court determined impeachment evidence not to be material under *Brady*. *See, e.g.*, *Banks*, 104 F.4th

at 511 (holding that officer's undisclosed misconduct was not material because it was immaterial to the trial); *Robinson*, 627 F.3d at 952–953 (holding that evidence of testifying officers' misconduct "would do little to damage the extensive physical and testimonial foundation of the case."); *United States v. Taylor*, 942 F.3d 205, 226 (4th Cir. 2019) (holding that evidence of government witness's criminal investigation was not material because it was cumulative and the witness' "testimony was limited to … only one of 22 predicate racketeering acts charged").

Defendants make much of the fact that Saa was the lone law enforcement witness to testify about how MS-13 worked, claiming that without his expert testimony, the jury would have disbelieved the cooperating MS-13 witnesses. Def. Br. 41. But the trial court concluded that "there was sufficient evidence to convict Defendants" even without Saa's testimony. JA3305; *see also United States v. Bartko*, 728 F.3d 327, 340–341 (4th Cir. 2013) (upholding trial court determination that impeachment evidence was not material where there was a "mountain of evidence marshaled against [the defendant]"). The trial court further determined that Saa "did not provide any direct or other crucial evidence related to the underlying offenses." JA3305. Defendants' argument requires this Court to ignore the fact that the cooperators corroborated each other, defendants' admissions to law enforcement corroborated the cooperators' testimony, and voluminous physical evidence

supported all of these statements. *See* JA3305; JA1239–1240, JA2288–2292, JA2351–2352, SA026–030, SA049–055.

Saa testified largely about the history, structure, and organization of MS-13. JA3303. All four MS-13 cooperators who testified discussed the structure and organization of the gang, and were corroborated by defendants' statements. *See* JA3303. And the corroboration was extensive. Three of the cooperators were GLCS members themselves, and testified about GLCS's rank structure, rules, common terminology and code words, and operations. *See* JA396–397, JA400–404, JA414–423, JA604, JA605, JA606, JA610–618, JA621, JA638–643, JA1453–1454, JA1464–1475, JA2202, JA2209–2210, JA2218. Further, wiretap conversations, messages and pictures exchanged between co-conspirators, video recordings, and law enforcement interviews with defendants independently supported the cooperators' testimony. *See* JA1844–1869, JA2171–2173, JA2177–2184, JA2724–2729, SA39–42, SA58–60, SA63–67. Defendants themselves admitted they were members of MS-13. JA3303. Faced with this "mountain of evidence," all of which was developed through an investigation that had nothing to do with Saa, it is little surprise that the trial court definitively concluded that there was "no reasonable probability of a different result." JA3304–3305; *Bartko*, 728 F.3d at 340.

The government's closing argument demonstrates concisely the minor import of Saa's testimony in the context of the broader trial. The government only drew

upon Saa's testimony thrice: to establish that MS-13 is a criminal enterprise with "a common purpose, a structure, and continuity," describe the gang's "structure, organization, and history," and recount the punishment for those who broke the gang's rules. SA8–9, SA14. But each cooperator also testified about these topics at length. Blanco Torres testified about MS-13's common criminal purposes, including drug activity and violence against rivals, the structure of the gang, and that for almost 15 years, he had been a member of two different MS-13 cliques in El Salvador and the United States. JA397, JA400–402, JA415–424. Amaya testified similarly, recounting that he knew even before joining MS-13 at age eight or nine that the gang committed crimes like "extortion," theft, murder, and drug dealing. JA604. He also explained the MS-13 rank structure, the responsibilities of each rank, and the rules and punishments of the gang. JA605, JA607, JA610–618, JA621, JA638–643. Likewise, Martinez Sanchez testified that he began associating with MS-13 when he was 14, and was fully aware that the gang "committed murders, sold drugs, extorted, [and] kidnapped." JA1453–1454, JA1464. He, too, explained the rank structure, the responsibilities of each rank and the means of ranking up, and how the gang operated and punished its rulebreakers. JA1464–1467, JA1471–1475. Finally, Bonilla testified that he joined MS-13 when he was 16, and described the gang's rank structure, drug-dealing, violence, and rules. JA2202, JA2209–2210, JA2218. With the rest of the government's closing argument dedicated to the ample evidence

that defendants committed the charged offenses, it is clear that Saa's testimony was, at most, a supporting thread in the case.

Defendants also cannot bootstrap what is immaterial impeachment evidence to somehow impugn the basis of Saa's expertise or the evidence against defendants. Defendants do not explain how any of Saa's misconduct is relevant specifically to the case against them, likely because, setting aside the matter of Saa's credibility, there is no plausible connection between the two. Saa was not an investigator in this case, and so none of his testimony affected the evidence establishing defendants' guilt. *See* JA3297; *cf. Banks*, 104 F.4th at 511–512 (holding that the trial court "reasonably concluded that [the witness] had played only a minor role in the … investigation as a whole and that his unrelated prior criminal conduct … did not call into question the evidence against the Defendants or the validity of their convictions."). The HPD referral of Saa to the FBI, and the FBI's assessment into Saa, were related to Saa's donation of holsters to the PNC—an activity unrelated to defendants, not least because El Salvador was *also* not involved in the investigation. JA3298. HPD's later determination that Saa had "violated several HPD policies, including insubordination and improperly using his police uniform," has no bearing on defendants' case, because none of these policies had anything to do with the quality of his expertise or the substance of the investigation into defendants. JA3299; *cf. Robinson*, 627 F.3d at 952–953 (holding that "[e]vidence regarding a

few officers' unrelated misconduct could do little to damage the extensive physical and testimonial foundation of the case."). The only concern HPD had with Saa's relationships with Salvadoran officials was that either Saa was acting as an unregistered foreign agent, *see* Def. Br. 23, or that Funes was generally a questionable individual who had been accused of involvement in "drug trafficking, corruption, and executions." JA3299. Neither of these concerns reflects a lack on Saa's part of expertise or knowledge about MS-13 as an organization, nor do they in any way relate to the investigation into defendants. *See* JA3303–3304 (trial court finding that defendant's argument of a "conspiracy between MS-13, Funes, and Saa to convict these Defendants" is "implausible, unsupported by the new evidence, and would not likely produce an acquittal.").

Lastly, defendants competently impeached Saa during cross-examination. "[W]here the withheld evidence is impeaching but the witness was impeached in other ways at trial, [this Court has] held that the withheld evidence was not material." *George*, 95 F.4th at 209; *see also Taylor*, 942 F.3d at 226 (holding that information that a witness was under investigation for drug offenses was immaterial when the witness was impeached with prior convictions). Here, Saa conceded on cross-examination that he had not personally participated in a gang investigation for nearly 10 years before testifying in this trial. JA3094–3098, JA3131. He testified that he had no advanced degrees relating to gangs, JA3091, did not study current

literature on the topic, JA3098–3099, had not taken any recent academic courses on MS-13, JA3099, and that his information regarding MS-13 rules was dated, JA3143–3146. In terms of the case at hand, Saa also conceded that he only had general knowledge of GLCS and had not investigated the defendants. JA3100, JA3140. Defense counsel even questioned Saa's knowledge of cliques in Northern Virginia using the transcript of his expert testimony in a trial in 2018. JA3133–3136. Evidence that HPD and the FBI had questions about Saa's conduct—which had nothing to do with his qualification as an expert or the investigation into defendants—would have done little to move the needle. "This is especially so because the evidence was not of the type that could have resulted in an acquittal." *Taylor*, 942 F.3d at 226; *see also* JA3304–3305 (trial court finding that the post-trial evidence relating to Saa was not material).

### 2. The government did not suppress post-trial impeachment information about Saa.

Alternatively, the government did not suppress HPD's referral of Saa to the FBI, FBI's opening of a preliminary assessment, or the Saa Materials. The district court emphasized that it made no "finding or suggestion in any way of wrongdoing by Government counsel." JA3301 n.6. The court had "no reason to doubt Government counsel's representations" that "they had no knowledge of the HPD/FBI inquiries until after the trial." JA3301 n.6. The court simply assumed "that suppression occurred in lieu of granting Defendant's Motion for Issuance of

Subpoenas." JA3301 n.6. Because defendants failed to demonstrate that the government suppressed this evidence, the Court can affirm the denial of defendants' motion for a new trial on this alternative ground. *See Ali*, 991 F.3d at 571.

While *Brady* imputes the "knowledge of some of those who are part of the investigative team … to the prosecutors regardless of the prosecutors' actual awareness," "[c]ourts have routinely refused to extend *Brady*'s constructive knowledge doctrine where doing so would cut against the agency principles underlying imputed knowledge and would require prosecutors to do full interviews and background checks on everyone who touched the case." *Robinson*, 627 F.3d at 952 (collecting cases); *see also Horner v. Nines*, 995 F.3d 185, 204–206 (4th Cir. 2021) ("[W]e have also rejected a framework that 'would … impose unacceptable burdens on prosecutors and the police.'").

This Court has previously determined that no suppression occurred in similar contexts. In *Robinson*, the defendant was convicted at trial of a number of drug-and firearms-related offenses after an investigation led by agents from the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") and law enforcement officers from the Criminal Investigation Division ("CID") of the Aiken County Sheriff's Office. 627 F.3d at 945–946. As part of the investigation, CID investigators asked the Narcotics Division of the Aiken County Sheriff's Office to assist with several controlled buys from the defendant, "which it did." *Id*. at 945. After trial, an

investigator with the Narcotics Division informed the ATF case agent that he and "several other Narcotics Division officers who worked [the defendant's] case had committed misconduct." *Id*. at 946. Four Narcotics Division officers ultimately resigned or were dismissed as a result of this misconduct, which was unrelated to the investigation into the defendant. *Id*. at 946–947. This Court held that the government did not suppress evidence of the Narcotics Division officers' misconduct because "the affected officers and the prosecutors worked across state/federal lines, where no one other than the officers themselves had any idea of impropriety, and where the misconduct was unrelated to [the defendant's] own investigation." *Id*. at 952.

Similarly, in *Taylor*, the Court affirmed the denial of a new trial because the prosecutors did not have actual or constructive knowledge during trial that one of the government's witnesses was under investigation for drug trafficking. 942 F.3d at 225. In that case, the defendants were convicted of their participation in a racketeering conspiracy, substantive acts of racketeering, and Hobbs Act robbery. 942 F.3d at 210. Using pole camera footage, the ATF agents identified the witness and noted that he was prohibited from possessing a firearm—visible on the video— due to his status as a felon. *Id*. at 224. The ATF provided this report to the U.S. Attorney's Office one day after the guilty verdicts were returned in the defendants' case. *Id*. Based on this "timeline," this Court recognized that none of the prosecutors

"would have known this new information before the verdicts were returned . . . ,
leaving nothing to impute to the specific prosecutors in this case." *Id.* at 225 (internal
quotation marks omitted). The Court further concluded that "the knowledge of the
ATF officers investigating [the witness] should not be imputed to the prosecutors in
this case." *Id.* at 225. Because "the ATF officers investigating [the witness] were
not part of" the team investigating the defendants, "which was made up of FBI
officers," "[i]mputing their knowledge to the prosecutors in this case would require
[the Court] to stretch *Brady* beyond its scope." *Id.* at 225.

Equally applicable is *Horner*, where the defendant sought habeas relief in part
on the basis that the government failed to disclose that an informant had been paid.
995 F.3d at 205. Specifically, the defendant had confessed to this informant that he
had shot the victim, which the informant's girlfriend then told Detective Hann, the
informant's former handler. *Id.* Because Hann had only used the informant for
narcotics investigations, he subsequently told Detective Alex, the investigator
leading the murder case, about the informant's information. *Id.* Although the two
detectives met with the informant, only Alex questioned him; Hann "was never an
investigator on the case, and he did not otherwise act on the case on behalf of the
police department or the prosecutor's office." *Id.* Hann also "never told anyone
associated with the … investigation or prosecution that [the informant] had been
paid on occasion for his drug-informant activities." *Id.* In refusing to impute Hann's

knowledge to the prosecution team, this Court upheld the state court's finding that "Hann was not a 'police investigator' assigned to the case, nor had he acted on behalf of the investigating division or the prosecution team." *Id*.

Likewise, here, the government did not possess any information regarding the Saa investigation, assessment, or findings at the time of trial. First, the government could not have suppressed the Saa Materials—that is, the FBI reports, HPD memoranda, and records of interviews conducted by HPD—because they did not exist at the time of trial. Instead, as of February 22, 2022, all that had occurred was that HPD had referred Saa to the FBI for a potential FARA violation, and the FBI had opened an assessment into the matter. *See* JA3262, JA3389–3390. No interviews had been conducted, no memoranda had been written, and no findings of misconduct or determinations about Saa's integrity had been made. *See* JA3262, JA3389–3390.

Further, the prosecution team did not have actual knowledge of HPD/FBI's investigation of Saa until after trial. *See* JA3402. In particular, the FBI-Washington Field Office's gang squad did not inform the U.S. Attorney's Office that an FBI public corruption squad had opened an assessment of Saa until March 29, 2022, a week after this trial concluded. JA3389.

Nor did the prosecution team have constructive knowledge of this information at the time of trial. Akin to the situation in *Robinson*, where the "prosecutors worked

across state/federal lines," Saa was a local law enforcement officer acting as an expert witness in a case investigated by both state and federal law enforcement. *See Robinson*, 627 F.3d at 952. However, unlike the officers in *Robinson*, neither Saa nor HPD participated in the investigation into defendants, thus removing them one step further from the federal investigative team. *Id.*; *see also Taylor*, 942 F.3d at 225.

The prosecution team could only have learned about HPD's referral of Saa and the FBI's preliminary assessment from HPD or from the FBI's public corruption squad. JA3298–3299, JA3389–3390. There is no evidence that Saa himself knew either of these facts, and it would make little sense for HPD or the FBI to have informed him prior to interviewing him several months after defendants' trial. Further, because HPD was not part of the investigation into defendants, "[i]mputing their knowledge to the prosecutors … would effectively impose a duty on prosecutors to learn of any favorable evidence known by *any* government agent." *Taylor*, 942 F.3d at 225; *see also Robinson*, 627 F.3d at 952. As the Court has observed, "It is one thing to require prosecutors to inquire about whether police have turned up exculpatory or impeachment evidence during their investigation. It is quite another to require them, on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case." *Robinson*, 627 F.3d at 952. And in this instance, Saa was not even an "officer working the case."

*Id*. If the knowledge of an uninvolved local agency like HPD could be imputed to the federal prosecution, it "would impose unacceptable burdens on prosecutors and the police," and "would require prosecutors to do full interviews and background checks on everyone who touched the case." *Id*.

Similarly, the FBI agents who knew of HPD's referral and the preliminary assessment were part of an entirely separate FBI squad than the two agents who testified at trial, and their knowledge likewise should not be imputed to the prosecution. JA3389–3390. The FBI's position in this investigation resembles that of the ATF agents in *Taylor* and Detective Hann in *Horner*. *See Taylor*, 942 F.3d at 225; *Horner*, 995 F.3d at 205. Defendants argue that because the FBI is part of the Department of Justice, knowledge of *any* FBI agent must be imputed to all prosecutors. Def. Br. 40–41. But this Court correctly held in *Taylor* that the knowledge of the ATF agents could not be imputed to the prosecution team, even though the ATF is also an agency under the Department of Justice. 942 F.3d at 225–226. Further, the FBI only assisted the investigation into defendants; it did not act as the lead. Only two of the witnesses at trial were FBI agents, neither of whom was assigned to the public corruption squad looking into Saa. JA249, JA2143. As such, the role of the FBI public corruption squad resembles that of Detective Hann in *Horner*, where Hann worked for the same Baltimore County Police Department that investigated the defendant in that case. *Horner*, 995 F.3d at 205. Although part of

49

the FBI as a whole, the public corruption agents were not "'police investigator[s]' assigned to the case, nor had [they] acted on behalf of the investigating division or the prosecution team." *Id*. Accordingly, their knowledge should not be imputed to the prosecution in this case.

Defendants baselessly assert that "the government knows this information is damning, [and] their own witnesses said so before the trial began." Def. Br. 42. There is no evidence that any witnesses at trial—*including Saa*—knew about HPD's referral of Saa to the FBI or the FBI's preliminary assessment, let alone any of the information contained in the Saa Materials. In fact, neither of the FBI agents who testified at trial even share the same initials with the one FBI agent interviewed as part of HPD's post-trial internal investigation into Saa.[4] *See* JA3388 (describing the audio recording of "Supervisory Special Agent M"). While defendants may consider FBI agents fungible, the fact remains that the agents investigating defendants were entirely separate from those looking into, or who were later interviewed in connection with, Saa's purported misconduct. And those public corruption agents

---

[4] Separately, while defendants take issue with the redactions in the Saa Materials, implying that they know no names of any FBI agents involved in the assessment of Saa, Def. Br. 42 n. 157, the government produced to defendants the names of those FBI agents, neither of whom testified against defendants. *See* JA3201 (Torres' subpoena duces tecum naming in full the two participating FBI agents on the public corruption squad).

were not "acting on the government's behalf in the case" against defendants. *See Taylor*, 942 F.3d at 225 (citing *Kyles v. Whitney*, 514 U.S. 419, 437 (1995)).

Although HPD ultimately determined months later that Saa had violated department policy by appearing in his uniform at the Salvadoran embassy event, there is no evidence that HPD shared this internal, non-criminal matter with the FBI. *See* JA3298. Again, while HPD might have known about it, it would exceed the scope of *Brady* to impute knowledge of an uninvolved local law enforcement agency to the federal prosecution team. *See Taylor*, 942 F.3d at 225. Defendants may argue, like the defendant in *Robinson*, that Saa's own awareness of having violated HPD policy should be imputed to the prosecution "[b]ecause the dismissed officer[] obviously knew about [his] own misconduct and because [he] was working on the government's behalf" when testifying. *See Robinson*, 627 F.3d at 951–952. But just as this Court found in *Robinson*, "[w]hatever the proper scope of *Brady*'s imputed knowledge doctrine, it cannot be this broad." *Id*. at 952. The prosecution has a duty to learn of favorable evidence, but it cannot read minds. *See id*.

As to the Saa Materials themselves, it bears repeating that they—and the findings of Saa's misconduct within them—did not exist at the time of the trial and therefore logically could not have been suppressed. Just as it would go well beyond *Brady* to expand agency principles to cover organizations and individuals not actually working on behalf of the investigating team, chaos would ensue if materials

not generated until months after trial could be retroactively suppressible by the prosecution under *Brady*. *Cf. Robinson*, 627 F.3d at 952 (observing that "requir[ing] prosecutors to do full interviews and background checks on everyone who touched the case" would be an "unacceptable burden on prosecutors and the police").

Lastly, no suppression occurs where evidence is obtainable from other sources through the exercise of reasonable diligence. *See United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) ("In situations such as this, where the exculpatory information is not only available to the defendant but lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine."); *see also United States v. Blankenship*, 19 F.4th 685, 694–695 (4th Cir. 2021) (holding that a defendant "should not be allowed to turn a willfully blind eye to available evidence and thus set up a *Brady* claim for a new trial."). To the extent that defendants argue that Saa's close relationship with Funes and the PNC is *Brady* material, *see* Def. Br. 30, this fact was easily discoverable prior to trial and Saa's curriculum vitae even established its existence. *See* JA3301 n.5. As the trial court found, "the event at the Salvadoran embassy appeared on social media and the press, and [Saa's] connection to the PNC was apparent based on … his Facebook page and curriculum vitae." JA3301 n.5. Indeed, Saa testified about his close relationship with Salvadoran law enforcement, including that he had "assisted El Salvador police" on multiple occasions. JA3087–3088, JA3142. As a result,

defendants were not prevented from learning about or pressing Saa on the depth of his relationship with Salvadoran law enforcement, which he himself raised as a primary source of his expertise. JA3086–3089.

In sum, because the prosecution did not suppress information related to Saa, the Court can affirm on this alternative ground.

### 3. Defendants' inability to cross-examine Saa at trial regarding the post-trial impeachment evidence was harmless.

Defendants weave a partial Confrontation Clause argument into their *Brady* claims, arguing that they were denied the opportunity to fully cross-examine Saa. *See* Def. Br. 43; U.S. Const. amend. VI. Whether defendants were deprived of their right to impeach Saa based on their alleged *Brady* claim is subject to harmless error analysis. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). The trial court correctly concluded on this point that "Defendants' inability to fully realize what would have supposedly been a damaging cross examination was 'harmless beyond a reasonable doubt.'" JA3305 (citing *Van Arsdall*, 475 U.S. at 684). For the reasons discussed above, the trial court was correct in finding that "[t]here was sufficient evidence, absent Saa's testimony to convict defendants. While Saa was the only law enforcement expert to testify about MS-13, he did not provide any direct or other crucial evidence related to the underlying offenses." JA3305. Moreover, defendants thoroughly cross-examined Saa on the basis of his expertise, knowledge, and lack of participation in the investigation, among other topics. *See* JA3091, JA3094–3100,

JA3131, JA3133–3136, JA3140, JA3143–3146. Additional cross-examination using the post-trial impeachment evidence would have gained the defendants little. *Cf. Taylor*, 942 F.3d at 226 (holding that information that a witness was under investigation for drug offenses was immaterial when the witness was impeached with prior convictions).

As a result, any inability by defendants to cross-examine Saa about the post-trial impeachment evidence was clearly harmless. *See Van Arsdall*, 475 U.S. at 684; *United States v. Fletcher*, 993 F.2d 1540, 1993 WL 149916, at *3–4 (4th Cir. 1993) (unpublished table decision) (upholding trial court decision denying the recall of a witness, which defendant alleged prejudiced him due to an inability to impeach the witness' credibility with newly discovered evidence). "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Van Arsdall*, 475 U.S. at 681. And here, defendants received a fair trial, where even the post-trial disclosure of impeachment evidence relating to Saa did not undermine confidence in the verdict. *See Taylor*, 942 F.3d at 225.

## Conclusion

Because defendants' challenges are without merit and the evidence was sufficient to convict them, this Court should affirm the judgments.

Respectfully submitted,

Jessica D. Aber
United States Attorney


_____ /s/
Amanda St. Cyr
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 13,000 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, signature block, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/
_____

Amanda St. Cyr
Assistant United States Attorney
